[No. 2383.]

THE FIRST NATIONAL BANK OF DENVER v. FOLLETT.

1. **Sales—Fraud—Burden of Proof.**

Creditors cannot successfully assault a sale of a stock of goods by their debtor on the ground of fraud without connecting the purchaser therewith, and the burden of proof is upon them to show the connection of the purchaser with such fraud.

2. **Sales—Fraud—Evidence—Innocent Purchaser.**

In an action by a creditor to set aside an alleged fraudulent sale of a stock of goods by a debtor, the evidence examined and held insufficient to show any connection of the purchaser with the alleged fraud, or to show any knowledge either actual or constructive on the part of the purchaser of the fraudulent intent of the debtor.

3. **Sales—Fraud—Instructions—Harmless Error.**

In an action by a creditor to set aside an alleged fraudulent sale of a stock of goods, where the evidence fails to connect the

purchaser with the alleged fraud of the seller, and the court would have been justified in withdrawing the question of fraud from the consideration of the jury, error, if any, committed in the instructions upon the question of fraud was not prejudicial to plaintiff and will not be considered on review of a judgment in defendant's favor.

4.  Sales—Fraud—Delivery—Possession.

Where a bill of sale to a stock of goods situated in Denver, Colorado, was executed in Chicago, Illinois, on the 8th day of the month and was delivered to the purchaser's agent on the. 9th with the understanding that the sale was not to become operative or take effect until the purchaser's agent had time to reach Denver and take possession of the property, which he did on the 11th day of the month, and held possession of the property for the purchaser until it was taken by the sheriff under a writ of attachment, there was an immediate delivery and actual and continued possession of the property sufficient to sustain the sale as against attaching creditors.

5.  Sales—Partnership—Individual and Firm Debts.

Where a loan was made to a partnership and the money went into the partnership business and was used for partnership purposes, although the debt was evidenced by an individual note of one of the members of the firm and was charged on the books of the firm as an individual debt of the member giving the note, and the partnership acknowledged the debt as a firm debt and paid interest thereon and subsequently executed a firm note for the debt, the debt was a partnership debt, and was a sufficient consideration to sustain a sale of partnership property in payment thereof as against other partnership creditors.

*Error to the District Court of Arapahoe County.*

Mr. Gerald Hughes, Mr. A. Moore Berry, Mr. Charles J. Hughes, Jr., Mr. Branch H. Giles, Mr. Henry J. O'Bryan, for plaintiff in error.

Mr. Alfred Muller, for defendant in error.

Maxwell, J.

February 11, 1898, The First National Bank of Denver, plaintiff in error, commenced suit in attachment against A. L. Deane & Co., a co-partnership consisting of A. L. Deane and J. W. Donnell,

doing business in Chicago and Denver, and caused a writ of attachment to be levied upon a stock of goods in the store premises, 503 Sixteenth street, Denver, Colorado.

Mrs. Follett, defendant in error, filed a petition in intervention, averring, that at the time of the levy of the writ of attachment she was the owner and in possession of the goods levied upon.

The answer to the petition in intervention, upon which trial was had, denied the allegations of the petition, except the seizure under the writ of attachment, and alleged that intervener falsely, fraudulently and wrongfully claimed to be the owner and in possession of the goods described in the petition; that there was no sale or delivery of possession of the same to the intervener; that there was a fraudulent agreement, conspiracy and combination between intervener and the members of the firm of A. L. Deane & Co. whereby the said firm attempted to sell and dispose of the property of the firm so as to hinder and delay the creditors of said firm; that the attempted sale was made February 8, but no attempt to take or assume possession was made until February 11; that February 8, A. L. Deane & Co. made and executed a bill of sale to intervener of the goods levied upon with the intent upon the part of A. L. Deane & Co. to hinder, delay and defraud the creditors of said firm, and that the intervener had full knowledge of such intent; that at the time the pretended bill of sale was made, the said firm of A. L. Deane & Co. was insolvent; that the pretended consideration for the said bill of sale was an individual debt of A. L. Deane and not a partnership debt of A. L. Deane & Co.; that plaintiff in error had a prior lien upon the partnership assets.

A replication denied the allegations of new matter in the answer.

The issues thus formed were tried to a jury which returned a verdict in favor of intervener, upon which judgment was entered that the intervener was the owner and entitled to the possession of the property described in the petition and levied upon by the sheriff by writ of attachment issued in the case.

The issues presented by the pleadings having been determined against plaintiff in error, by the verdict of the jury, upon conflicting evidence, the judgment must be approved unless prejudicial error was committed by the court in the conduct of the trial.

We will not undertake to review the 158 errors assigned by plaintiff in error, but will confine the discussion to errors disclosed and relied upon by counsel in their briefs and upon oral argument, and for this purpose we will group the errors assigned as follows:

1. Fraudulent intention upon the part of A. L. Deane & Co., and knowledge and connection therewith by intervener.

2. Immediate delivery, followed by actual and continued change of possession of the goods and chattels in controversy.

3. Was the debt, which was the consideration for the bill of sale, the individual debt of A. L. Deane?

4. The rulings of the court in the reception and rejection of testimony.

The case made by the pleadings, as above set forth, and the testimony so far as need be stated, is as follows:

In 1887 Mrs. Follett was possessed of $9,000.00, which she proposed, through her son-in-law, J. W. Donnell, to loan to the firm of A. L. Deane & Co., the defendants herein. At this time she never had met Deane. The loan was made to the firm of A. L. Deane & Co. evidenced by a promissory note, whether signed by the firm name or the individual members of the firm, is in doubt from the testimony.

That the money went into the firm business and was used for its exclusive benefit is undisputed. The books of the firm show that, March 15, 1887, the account of A. L. Deane was credited with $9,000.00, and semi-annually thereafter the same account was debited with $315.00 on account of interest paid to Mrs. Follett, for which interest Mrs. Follett signed receipts to A. L. Deane individually. The books of the firm also show, that in the annual settlements, the interest account was adjusted between the partners. From time to time, prior to January, 1898, orally and in writing, the firm acknowledged this indebtedness as firm indebtedness. The note appears to have been renewed from time to time. In the latter part of 1897, Mrs. Follett became uneasy about this investment and through her son placed the note for collection with Mr. Stedman of the law firm of Stedman & Soelke of Chicago, Mrs. Follett then being a resident of St. Louis, Mo. Mr. Stedman interviewed Deane & Co., and on January 5, 1898, received from the individual members of the firm, a note for $9,000.00 payable to Mrs. Follett January 27, 1898, secured by a second mortgage on the home of J. W. Donnell, this note and mortgage being given as additional security for the claim, and on January 10, 1898, Mr. Stedman received a demand judgment note for $9,000.00 signed by the firm name and by the individual members thereof. They stated to him at that time, that they were hard pressed, but expected shortly to receive funds which would relieve their embarrassment. Subsequently, the firm informed Mr. Stedman that the expected funds were not forthcoming, that they had a stock of goods in Denver sufficient to pay the claim. Mr. Stedman objected to taking the stock of goods in settlement of the claim without having express authority from Mrs. Follett to that effect. He thereupon drew a power of attorney giving him

the desired authority, gave it to Donnell, who took it to Mrs. Follett at St. Louis and returned it to Mr. Stedman, executed by Mrs. Follett. Acting under this power of attorney, Mr. Stedman drew a bill of sale incorporating therein an itemized schedule of the personal property involved herein, which bill of sale was dated and acknowledged February 8 and delivered to Mr. Stedman about 5 p. m. on February 9. The consideration expressed in the bill of sale was $9,000.00. At the time the bill of sale was delivered to Mr. Stedman, Donnell demanded the return of the note and the release of the mortgage on his home, which he had given as additional security for the claim. Mr. Stedman declined to comply with this demand, saying: ''I will take the bill of sale, but I will not regard it as sold nor completed, until I have possession of the goods in Denver. I will leave the note and the release with Mr. Soelke, and when I am in possession of the goods there, I will telegraph Mr. Soelke that I am in possession and he can deliver those to you.''

At an interview which Mr. Stedman had with the members of the firm of Deane & Co. he learned from them that they were owing a large amount for rent and were indebted to two other parties, in what amount not appearing. It appears that on February 9, the date Mr. Stedman testified the bill of sale was delivered to him, he, as a notary public, took an acknowledgment of Deane to a deed conveying to Deane's daughter, certain real estate. Mr. Stedman testified that he did not know the contents of the deed, not being required as a notary to make a record thereof.

The foregoing is all the knowledge disclosed by the testimony, which Mr. Stedman had of the affairs of Deane & Co., and all connection he had with their business or the business of either member of the firm, previous to the time when he accepted the bill of sale.

For reasons which seemed to be good and sufficient to Mr. Stedman, he did not leave Chicago for Denver until the morning of February 10, although there were trains leaving Chicago for Denver the evening of February 9, after he had received the bill of sale.

He arrived in Denver at 1:30 p. m. February 11, went to the Windsor hotel, and without waste of time, proceeded to the office of Muller & Weil, attorneys, where he explained to them his business and with them proceeded, without delay, to the store of A. L. Deane & Co., 503 Sixteenth street, arriving there about 2:30 p. m., where he met and was introduced to Mr. Weiant, who was the manager in Denver of the business of A. L. Deane & Co. It appears that the members of the firm of Deane & Co. were seldom, if ever, in Denver, that Mr. Weiant was the active manager in charge of their business here, although he had no interest as a partner in the business. On arriving at the store Mr. Stedman presented to Mr. Weiant a letter from A. L. Deane & Co., at Chicago, instructing him (Weiant) to turn over to Mr. Stedman, representing Mrs. Follett, all cash on hand and all goods and chattels belonging to the firm of A. L. Deane & Co. in Denver. He also handed Mr. Weiant the bill of sale and asked him if the goods were in stock, to which Mr. Weiant replied: "Substantially so, except such changes as might have been made by sales and additions to the stock since the first of the month."

Mr. Stedman said that he would take possession, and requested Mr. Weil to put up signs which had been prepared, to which Mr. Weiant replied: "Well, go ahead and put them up, I am out of it."

The signs, "Mrs. C. E. Follett, owner, in possession," were written on sheets of paper with pen and ink and were pasted, by Mr. Weil, on the front and side entrances to the store.

Mr. Stedman then took possession of the cash on hand, ordered checks drawn for wages due to employees to date, and for the balance of the cash in the bank to himself, which checks were signed by Mr. Weiant and delivered to Mr. Stedman; he received from Mr. Weiant a key to the store; the insurance policies on the goods were delivered to him and new insurance ordered written in the name of Mrs. Follett; a telegram was sent to Mr. Soelke at Chicago, notifying him that Mr. Stedman was in possession of the stock; a sign painter was telephoned for, to change the signs, and so far as possible everything was done by him (Stedman) to indicate a change of possession and ownership.

During this time the store doors were not locked and people were coming and going as usual.

It appears that Mr. Weiant delivered possession of the store to Mr. Stedman, of which action he subsequently repented, upon the advice of his counsel, who seems to have advised him, that while he could not hold possession as an employee of Deane & Co., he might do so as a debtor of The First National Bank, being jointly liable with Deane & Co. upon the paper in suit herein.

During the afternoon the cashier of The First National Bank was notified that Mr. Stedman had taken possession, and previous to the levy of the writ of attachment, visited the store and was so advised by Mr. Stedman. Mr. Stedman remained at the store and retained possession as above indicated, until about 5:30 p. m., when the sheriff levied the writ of attachment, took possession of the stock and premises, and put Mr. Stedman and his associates out of the store.

1. The creditors of A. L. Deane & Co. cannot successfully assault this sale on the ground of fraud charged, without connecting Mrs. Follett or her attor-

ney therewith, and the burden is upon them to establish this fact.—*H. B. Clafflin Co. v. Lass,* 17 Colo. App. 156, 158; *Nicholls v. McShane,* 16 Colo. App. 165, 177.

A careful examination of the record shows that the evidence wholly fails to connect either Mrs. Follett or her attorney with the alleged fraud of Deane & Co., and wholly fails to prove knowledge, actual or constructive, upon their part of the fraudulent intent of Deane & Co.

In this state of the case the court would have been justified in withdrawing from the consideration of the jury the question of fraud.

This question was submitted to the jury under instructions which are assailed by plaintiff in error as erroneous. Failure to connect the intervener with the alleged fraud of her grantor was fatal to plaintiff in error's recovery upon this branch of the case, and a discussion of the instructions complained of would lead to no beneficial results.

"To vitiate the transfer in such case the grantee also must be chargeable with knowledge of the intention of the grantor."—*Pruitt v. Wilson,* 103 U. S. 22; *Seeleman v. Hoagland,* 19 Colo. 231, 235; *Smith v. Jensen,* 13 Colo. 213, 219.

Applicable to this record is the statement of our supreme court in *Reithman v. Godsman,* 23 Colo. 202, 209: "In this connection it is fitting to say that although the court, probably out of an abundant caution, saw fit to submit to the jury the question of fraud, nevertheless it might, with safety, have withdrawn the same, because there was a failure to connect Godsman (plaintiff in error) therewith."

2. Was there immediate delivery followed by an actual and continued change of possession? While it is true that the bill of sale was dated and acknowl-

edged February 8, delivered to Mr. Stedman February 9, and possession not taken until the 11th, the undisputed testimony is, that the sale was not to become operative or take effect, until Mr. Stedman had had time to reach Denver and take possession of the property; in other words, the sale was conditional, to become absolute upon the happening of certain events.

This transaction, while differing in some respects from the cases made in *Finding v. Hartman*, 14 Colo. 596, and *Roberts v. Hawn*, 20 Colo. 77, is clearly within the class of conditional bills of sale or contracts discussed in those cases, and subject to the rules there laid down.

In this view of the case, there can be no question upon this record, of immediate delivery and actual and continued change of possession of the property in controversy.

The instructions of the court to the jury upon this branch of the case, taken as a whole when considered in connection with the evidence, were free from substantial error.

3. Was the debt, which was the consideration for the bill of sale, a partnership or individual debt?

Upon this proposition, at the request of plaintiff in error, the court instructed the jury:

"If you believe from the evidence that the $9,000.00, for which it is alleged the bill of sale was made, executed and delivered by A. L. Deane & Company to the intervener herein, was not a partnership debt of the said A. L. Deane & Company, but was, in fact, an individual debt of A. L. Deane or J. W. Donnell, or both, as individuals; and if you further believe from the evidence that A. L. Deane & Company at the time that the said bill of sale was made, executed and delivered, were insolvent, then the said A. L. Deane & Company had no right to sell or trans-

fer the goods described in the said bill of sale for the purpose of paying individual debts, for the reason that partnership property cannot be appropriated by the partnership to pay the individual debts of the members thereof when the said partnership is insolvent, your verdict must be for The First National Bank.''

Other instructions to the same effect were given at the request of plaintiff in error. Complaint is made by plaintiff in error of the following instruction given at the request of defendant in error:

''The court instructs the jury that where money is obtained by a member of a partnership on the personal credit of the member of the firm but the money went into the firm and was used for its exclusive benefit, it would be a good consideration in law to support a subsequent promise of the firm to pay the debt, and if the partnership thereafter conveyed to the creditor partnership property in payment of such debt, it is not the application of the partnership effects to the private debt of a member of the firm, but the proper assumption by both partners of a debt created for their joint benefit. And so the court instructs you that, even though you may find from the evidence that this money was advanced on the personal credit of A. L. Deane, a member of the firm of A. L. Deane & Co., still, if you further find from the evidence that the money went into the firm and was used for its exclusive benefit, that the assumption of the debt thereafter by A. L. Deane & Co. and the transfer of partnership property by them to Mrs. Follett for the purpose of paying partnership debts is valid in law as against partnership creditors.''

In view of the evidence in this case, the instruction last quoted, considered with the whole charge, was not erroneous.

The proposition, that where an insolvent partnership transfers its property for the purpose of paying an individual debt of a member of the partnership, such transaction is a fraud upon the creditors of the partnership, cannot be controverted. But that principle is not applicable to this case. The testimony shows beyond question, that the original loan was made to the partnership, although it may have been evidenced by A. L. Deane's individual note, entered upon the books of the firm as an individual matter of Deane's; that the money was applied to partnership purposes; that the partnership orally and in writing acknowledged the debt as a partnership debt; that the interest was paid by the partnership and that the judgment note, which was the consideration for the bill of sale involved herein, and which was surrendered at the time the bill of sale was given, was signed in the firm name and by the individual members thereof.

In *Siegel v. Chidsey*, 28 Pa. St. 279, the facts were:

"George Field was engaged in the mercantile business in the borough of Easton, and had a considerable stock of goods, and had incurred debts and liabilities in the prosecution of his business. On the first of September, 1847, Field and John Siegel, Jr., entered into partnership in the store and with the stock of goods which Field then had on hand. John Siegel, Sr., loaned to his son, John Siegel, Jr., the sum of $2,200.00 and took from him a single bill for the amount, dated 31st August, 1847. This money went into the firm, was used in paying debts then existing, and in purchasing other goods for the use of the firm. On the twenty-third of March, 1852, this single bill of John Siegel, Jr., was taken up and the two partners on that day gave their single bill in its stead, with warrant of attorney to confess judg-

ment for $2,274.23. In March, 1853, the firm of Field & Siegel failed. Judgment was entered on the single bill in favor of John Siegel, Sr., and an execution issued upon it. Russell S. Chidsey was also a creditor of the firm and obtained judgment against it, and issued an execution which came to the sheriff's hands subsequent to that of John Siegel, Sr.

"The property of the firm was sold under these and prior executions, and the proceeds not being sufficient to satisfy both Siegel and Chidsey's executions, the latter claimed to have preference on the ground that the claim of Siegel was not a debt of the firm, but the private debt of John Siegel, Jr., one of the partners and that the giving of the firm's note for it was in fraud of the firm's creditors."

The court said: "Unquestionably the debt of John Siegel, Jr., to his father, John Siegel, Sr., was originally an individual and not a partnership debt. The paper taken for it proves it such, and the verdict has fixed it as the debt of one partner. But it is equally clear that the money, though obtained on the personal credit of John Siegel, Jr., went into the partnership funds and was used for the exclusive benefit of the firm of Field & Siegel. Now, although this circumstance would not, of itself, make the firm liable to the creditor—5 Watts 454, 6 Harris 412—yet it would be a consideration to support the firm's subsequent promise to pay. The single bill of 23d March, 1852, was such a promise. It was an express undertaking on the part of the firm, upon a sufficient consideration, to pay this debt out of the partnership assets. It became at that moment a partnership debt for all intents and purposes.

This was not the application of partnership effects to the private debt of one member of the firm, but it was the honest and fair assumption by both members of the firm of a debt which had been created

for their benefit, and which in equity and conscience they were both equally bound to pay."

"Thus if money is in fact borrowed for the partnership business, or it is in fact applied to the partnership business, in the absence of all controlling circumstances, the partnership will be bound therefor, since the fair presumption is that it was intended by the partner to pledge the partnership credit, and not merely his individual credit, whether the partnership was known or unknown to the lender."—Story on Partnership, 139.

4. Careful consideration has been given the many assignments of error predicated upon the rulings of the court in the rejection and reception of evidence.

We have failed to discover prejudicial error in any of these rulings which would warrant a reversal of the judgment.

The judgment will be affirmed.

*Affirmed.*